# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Shelby Division[1]

IN RE:

ROBBINS SERVICE GROUP, LLC,

    Debtor.[2]

Chapter 11

Case No. 23-40082

## EMERGENCY MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL AND GRANTING RELATED RELIEF

Robbins Service Group, LLC, (the "Debtor"), debtor-in-possession in the above-captioned case, hereby moves (the "Motion") the Court for entry of emergency and final Orders, pursuant to sections 105, 361, 363, and 1184 of title 11 of the U.S. Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to use cash collateral to fund the Debtors' post-petition business operations as set forth below:

    (a)    authorizing the Debtor to use the cash collateral of United Community Bank ("UCB) and certain other purported secured lenders;

    (b)    providing adequate protection to UCB and such other purported secured lenders for the use of its cash collateral as set forth more fully herein; and

    (c)    scheduling a final hearing ("Final Hearing") with respect to each of the foregoing matters.

In support of this Motion, the Debtor respectfully states as follows:

---

[1] Contemporaneously herewith, Debtor has filed Debtor's Motion for Entry of an Order Changing Venue to the Charlotte Division of the United States Bankruptcy Court for the Western District of North Carolina.

[2] Debtor is the following entity (the last four digits of its taxpayer identification number follow in parentheses): Robbins Service Group, LLC (6879). The Debtor's address is 4340 N NC-16 Business Highway, Denver, North Carolina, 28037.

## JURISDICTION

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the Motion is proper under 28 U.S.C. § 1408.

2.      The statutory bases for the relief requested herein are sections 105, 361, 363, and 1184 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

3.      On May 15, 2023, (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11 subchapter V of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as a debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.

4.      The Debtor is a North Carolina limited liability company that operates a landscaping business doing business as Whispering Pines Landscaping.  The Debtor's services generally include landscape design, installation, and maintenance. The Debtor's geographic focus is primarily the Lake Norman area.

5.      In the operation of its business, the Debtor entered into several pre-petition arrangements with certain secured creditors[3] who purport to have security interests in the Debtor's cash.

---

[3] The Debtor is currently investigating the validity and scope of the secured claims against it, and it, therefore, reserves any and all rights regarding any liens asserted against its assets. The identification of the existence of such purported liens is not an admission as to the validity, perfection, priority or the extent of such lien or interest. The Debtor seeks such relief and identifies such liens out of an abundance of caution to ensure all potentially valid security interests are identified such that the Debtor receives the appropriate authorization from the Court to use such cash collateral.

6.      In support of this Motion, the Debtor relies on the Affidavit of Michael A. Robbins in Support of First Day Relief (the "Robbins Affidavit"), filed contemporaneously herewith.

## A.      SBA Loan

7.      On or about July 31, 2020, the Debtor entered into a Loan Agreement, Note, and Security Agreement related to a Small Business Administration loan (collectively, the "SBA Loan"). The amount borrowed was $639,400, and the lender was Aquesta Bank. The SBA Loan matures in 2030 and requires payments of $6,939.17 monthly, which constitutes payment of principal and interest. The interest rate on the loan is the Prime Rate (as that term is defined in the Note) plus 2.25%.

8.      The Security Agreement executed in conjunction with the Loan Agreement and Note purports to give Aquesta Bank a security interest in accounts receivable, instruments, chattel paper, contract rights, and general intangibles, among other collateral. On July 28, 2020, Aquesta Bank filed its UCC Financing Statement with the North Carolina Secretary of State (the "NCSOS"), asserting a blanket lien on all of the Debtor's assets.

9.      Upon information and belief, Aquesta Bank is a predecessor in interest to United Community Bank ("UCB") such that UCB is the current holder of the SBA loan.

10.     As of the Petition Date, the Debtor believes the total amount owed to UCB is $508,314.08.

## B.      MCAs

11.     As more fully explained in the Robbins Affidavit, filed contemporaneously herewith, the Debtor entered into certain agreements and arrangements with merchant cash advance lenders—EBF Holdings, LLC, doing business as Everest Business Funding ("Everest")

on or about Sept. 13, 2022; White Road Capital LLC, Series: 144665, doing business as GFE Holdings ("GFE") on or about October 18, 2022; Global Merchant Cash Inc. ("Global Merchant") doing business as Wall Street Funding on or about May 19, 2022; Kalamata Capital Group, LLC, ("Kalamata") on or about August 19, 2022; and Green Grass Capital ("Green Grass")[4] on or about January 26, 2023 (collectively, the "MCAs").

12.     These agreements purported to be purchase and sales of future receivables or revenues with the MCAs advancing some amount of money in exchange for a repayment commitment from such future receivables and/or revenues. However, the transactions have the characteristics of loans rather than true sales because, in part, the MCAs have recourse against the Debtor along with certain guarantors; the Debtor continued to service the accounts and then used funds received from the accounts to pay the MCAs; and the course of performance between the Debtor and the MCAs reflect a debtor-creditor relationship, among other factors. Also, upon information and belief, certain of the MCAs filed UCC-1 Financing Statements[5] with the NCSOS purportedly for the same accounts and receivables. The Debtor disputes the amounts owed to the MCAs as well as their purported security interests but includes the MCAs in this relief out of an abundance of caution. The Debtor reserves all rights to dispute the amounts owed to the MCAs as well as any security interests asserted by the MCAs as appropriate.

7.     More specifically, immediately after funding the Debtor, the MCAs began debiting the Debtor's bank accounts through ACH withdrawals, creating chaos with the Debtor's cash flow, which fluctuated day-to-day and sometimes hour-by-hour. While the Debtor

---

[4] The Debtor disputes the validity of the Green Grass security interest—as well as the existence of any amounts owed to Green Grass—because Green Grass was paid in full pursuant to a settlement agreement entered into between the Debtor and Green Grass prepetition.

[5] Global Merchant identified itself as a secured party in its financing statement, however, no other MCAs filed financing statements in their own names. Additionally, several financing statements were filed by Corporation Service Company as Representative, making it difficult for the Debtor to determine the identity of the secured party standing behind Corporation Service Company.

attempted to keep cash on hand to satisfy the amounts it anticipated the MCAs would draw, the Debtor was unable to do so.[6] If the Debtor's bank accounts had insufficient funds to satisfy the ACH draws, the Debtor would incur more costs due to insufficient funds fees charged by its banking institutions and then charged as penalties by the MCAs.

13.     Additionally, even as the Debtor was in communication with the MCAs to find a tenable solution that provided the Debtor with cash flow while also remitting payments to the MCAs, certain MCAs sent out purported lien notices or lien holds to all of the Debtor's customers, causing administrative chaos as the Debtor fielded calls and emails about the notices and throwing the Debtor's cash flow further into chaos as certain clients, concerned by the aggressive tactics of the MCAs, refused to pay the Debtor funds owed until the MCAs released the notices and holds. As the MCAs locked up the Debtor's cash flow, the Debtor scrambled to make some payment in exchange for lien releases. Despite the Debtor's good faith efforts to come to reasonable—and sustainable—payment plans with the MCAs, the MCAs instead continued to hold the Debtor's receivables hostage and frequently demanded payment or the lien holds would be sent again.

## **NEED FOR USE OF POST-PETITION CASH COLLATERAL**

14.     The Debtor's goal in this case is to continue operating its business and prevent the MCAs from continuing to hold the Debtor's operations hostage through the ongoing threats to send their lien holds and statements to the Debtor's customers and vendors as more fully described in the Robbins Affidavit such that the Debtor can preserve the value of its estates for the benefit of all its constituencies. The Debtor's goal is to confirm a consensual plan that pays all valid, allowed, and legitimate claims.

---

[6] The Debtor reserves all rights in law and equity, including under the Bankruptcy code, related to the prepetition actions taken by the MCAs. The Debtor anticipates determining whether to seek any recourse against any MCAs for such prepetition actions at the appropriate time.

15.     The Debtor has an immediate and emergency need, along with a continuing need, for the use of assets that may constitute its secured lenders post-petition cash collateral (the "Cash Collateral") to pay the expenses of operating its business including, without limitation, salaries, administrative and leasing costs, utilities, services, repairs, maintenance and insurance costs in their capacity as a debtor-in-possession. Specifically, without use of post-petition Cash Collateral, the Debtor cannot pay wages, salaries, rents, utilities and other expenses associated with operating their business, and administrative expenses of this Chapter 11 Case. The Debtor has no material unencumbered assets that could be used to fund the business without the use of Cash Collateral.

16.     The availability of the use of post-petition Cash Collateral will provide the Debtor with more than just the necessary cash it needs to operate its business. Of almost equal importance is the sense of confidence that such use of post-petition Cash Collateral will instill in the Debtor's suppliers, customers and employees. The failure of the Debtor's suppliers and employees to cooperate with the Debtor at this time, and the potential attendant loss of customers and sales, could irreparably harm the Debtor's hopes of maximizing the value of its assets and its chances for a successful reorganization, which will benefit all stakeholders, including the secured creditors to the extent that they have legitimate claims.

17.     In sum, without the immediate use of post-petition Cash Collateral, the Debtor will continue to suffer the acute liquidity crisis—and cash flow fluctuations—that existed prepetition, threatening the Debtor's ability to maintain its operations in the short term and causing the Debtor to file this Chapter 11 Case. The Debtor's ability to remain a viable entity and restructure under chapter 11, subchapter V of the Bankruptcy Code is dependent upon the Debtor obtaining the interim and final relief sought in the Motion.

18.    The Debtor believes that, to the extent UCB holds valid, perfected liens in all of the Debtor's assets, UCB has ample equity cushion. The Debtor believes that its assets have a value of $1,440,495.66 as shown on its balance sheet through March 31, 2023. UCB's debt is $508,314.08, therefore, the Debtor believes that UCB has an equity cushion in excess of $900,000 with respect to any valid lien. As demonstrated by the Interim Budget attached hereto as **Exhibit A** (the "Interim Budget"), the value of UCB's alleged collateral is not expected to decrease substantially, if at all, during the Interim Period. The Debtor also proposes to provide UCB with replacement liens on the proceeds of the Cash Collateral in the same priority as UCB's prepetition security interests to the extent that such interests are valid.

19.    Finally, the same holds true for the MCAs to the extent they hold valid, perfected liens in the Debtor's accounts, receivables, and/or future earnings. The Debtor disputes the amounts owed to the MCAs and anticipates marking such claims as disputed in its schedules of assets and liabilities to be filed later in the Chapter 11 Case. Alternatively, should the Debtor determine that such liens are valid and perfected, the Debtor may move to value the MCAs' collateral if appropriate. But to the extent that the MCAs hold valid, perfected liens in the Debtor's accounts, receivables, and/or future earnings, the Debtor believes the MCAs also have an appropriate equity cushion. More specifically, the Debtor allegedly owes Everest roughly $63,843; Kalamata roughly $102,790; Global Merchant roughly $73,933; and GFE roughly $96,690 for a total of roughly $337,256.

20.    Certain MCAs may have filed financing statements with the NCSOS, however, aside from Global Merchant, the Debtor cannot identify which MCAs may have filed such financing statements. Even if the MCAs had filed financing statements for the Debtor's accounts and future receivables, the MCAs are adequately protected because of the equity cushion in their

collateral. More specifically, the Debtor's total income for January through March 2023 was
$1,058.001.13, and the Debtor has budgeted total income for the second quarter to be
$1,144,250, providing ample equity cushion to the MCAs should they have valid security
interests in the Debtor's accounts and future receivables. The Debtor also proposes to provide the
MCAs with replacement liens on the proceeds of the Cash Collateral in the same priority as their
prepetition security interests to the extent that such interests are valid.

## RELIEF REQUESTED

21.     Pursuant to this Motion, the Debtor seeks authority to use Cash Collateral on an
interim basis to continue to operate in the ordinary course of business. The Debtor proposes to
use the Cash Collateral as set forth herein and only to the extent such use of the Cash Collateral
is vital to its business operations.

22.     The Debtor requests a preliminary hearing on an emergency basis to approve this
interim request pursuant to Rule 4001(b)(2) with a final hearing to be set by the Court at a later
date.

## BASIS FOR RELIEF REQUESTED

23.     The Bankruptcy Code provides that a debtor-in-possession may not use cash
collateral absent consent of the secured party or court approval. 11 U.S.C. § 363(c)(2).
Furthermore, the Debtor's use of property of the estate is governed by section 363 of the
Bankruptcy Code, which provides in pertinent part:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and
> unless the court orders otherwise, the [debtor-in-possession] may
> enter into transactions, including the sale or lease of property of the
> estate, in the ordinary course of business, without notice or a
> hearing, and may use property of the estate in the ordinary course
> of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

27.    Section 363(c)(2) permits the debtor-in-possession to use, sell or lease cash collateral only if either (i) each entity that has an interest in such cash collateral consents; or (ii) the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section. 11 U.S.C. § 363(c)(2).  If the secured creditor does not consent to the use of its cash collateral, the Court can authorize the debtor to use such cash collateral under section 363(c)(2)(B) if the Court determines that the debtors has provided "adequate protection" of the secured creditors' interests.  11 U.S.C. § 363(e). Adequate protection must be determined on a case-by-case basis, permitting a debtor maximum flexibility in structuring its adequate protection proposal. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (stating that courts consider adequate protection as a flexible concept that is to be decided on a case-by-case basis); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985) (stating that adequate protection should be determined on a case-by-case basis).

28.    A creditor is adequately protected by an equity cushion. United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370-71 (1988). Accordingly, courts have routinely found that an equity cushion of 20% or more constitutes adequate protection. In re Snead, 2008 Bankr. LEXIS 1160 (Bankr. E.D.N.C. Apr. 1, 2008); In re Kost, 102 B.R. 829, 831 (Bankr. D. Wy. 1989) (finding that most courts recognize a 20% equity cushion constitutes adequate protection). Equity cushions less than 20% have been recognized as sufficient adequate protection as well. See Lee Tractor Co., No. 07-03928 (Bankr. E.D.N.C. Nov. 29, 2007) (finding an equity cushion of approximately 13% provides sufficient protection

of secured creditor's interest); In re Dynaco Corp., 162 B.R. 389, 398 (Bankr. D.N.H. 1993) (finding that a 17% equity cushion constitutes adequate protection).

29.      If a debtor's proposed use of cash collateral augments the value of the secured creditor's collateral, adequate protection exists. See, e.g., Reconstruction Fin. Corp. v. Kaplan (In re Waltham Watch Co.), 185 F.2d 791, 797 (1st Cir. 1950) (use of cash collateral authorized under Bankruptcy Act to allow debtor to assemble watches out of tens of thousands of watch parts where such use increased the overall value of debtor's assets); In re Ralar Distributors, Inc., 166 B.R. 3, 6 (Bankr. D. Mass. 1994) (creditor had adequate protection where debtor's use of collateral allowed realization of more than liquidation value); In re Pine Lake Village Apartment Co., 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982) (creditor had adequate protection where debtor used cash collateral to maintain and preserve the value of the collateral).

30.      Unless the Debtor obtains emergency approval of this Motion for continuing Court authorization to use Cash Collateral pursuant to section 363 of the Bankruptcy Code for the purposes requested, the Debtor and its assets will suffer immediate, continuing, and irreparable harm.

31.      Pending the final hearing, the Debtor requires immediate use of Cash Collateral for, among other things, the purchase of supplies and materials for its operations, the funding of payroll obligations, and the funding of its on-going business operations and other working capital needs. Absent immediate use of the Cash Collateral for its continuing business operations, the Debtor will be unable to pay essential operating expenses and purchase supplies and materials, and therefore, may be unable to continue to conduct its business pending the final hearing on the relief requested herein.

32.      Accordingly, the Debtor requests that, pending a final hearing, the Court schedule an interim hearing as soon as practicable to consider the Debtors' request for authorization to obtain emergency use of Cash Collateral.

**<u>NOTICE</u>**

33.      Notice of this Motion has been given to the following parties: (i) the holders of the twenty largest general unsecured claims against Debtor; (ii) the Internal Revenue Service; (iii) the Office of the Unites States Attorney for the Western District of North Carolina; (iv) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina;, (v) UCB, and (vi) the MCAs. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court:

A.      Conduct an emergency hearing on this Motion in accordance with sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001;

B.      At the emergency hearing, determine that the Debtor has given adequate notice of the emergency hearing on the approval of the use of Cash Collateral as to content, persons, and time;

C.      At the emergency hearing, grant the Motion on an emergency basis pending a final hearing;

D.      At the emergency hearing, enter the Interim Cash Collateral Order approving the use of Cash Collateral as set forth herein on an emergency interim basis for cause shown, and approving the use of Cash Collateral by the Debtor;

E.      At the emergency hearing, authorize the Debtor, immediately and on an ongoing basis, to use any and all of the cash proceeds Cash Collateral to pay the ordinary expenses of operating its business and to fund the administrative expenses of this case in accordance with the Interim Budge, including a ten percent (10%) permitted variance without further order of the Court, attached hereto as **Exhibit A**;

F.      At the emergency hearing, set this Motion for a final hearing upon due notice, in accordance with sections 105, 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014; and

G.      Grant such other and further relief as the Court deems just and proper.


This the 15th day of May, 2023.

RAYBURN COOPER & DURHAM, P.A.

By:      /s/ Matthew L. Tomsic
          C. Richard Rayburn
          N.C. State Bar No. 6357
          Matthew L. Tomsic
          N.C. State Bar No. 52431
          Ashley B. Oldfield
          N.C. State Bar No. 56552
          Suite 1200, The Carillon
          227 West Trade Street
          Charlotte, NC  28202
          (704) 334-0891

          *Proposed Counsel to the Debtor*

**<u>Exhibit A</u>**

**Interim Budget**

# Whispering Pines Landscaping

## Operating Budget

May - July 2023

| | |
|---|---:|
| Revenue | |
| Sales | $985,000.00 |
| CC Fees | $4,925.00 |
| Net Sales | $980,075.00 |
| Cost of Goods Sold | |
| Materials | $236,400.00 |
| Labor | $334,900.00 |
| Total Cost of Goods Sold | $571,300.00 |
| Gross Profit | $408,775.00 |
| Operating Expenses | |
| Wages | $247,000.00 |
| Advertising | $12,312.50 |
| Fuel | $24,000.00 |
| Repairs & Maintenance | $17,000.00 |
| Rent/Lease | $40,500.00 |
| Utilities/Telephone Expenses | $7,500.00 |
| Insurance | $38,000.00 |
| Office Supplies | $5,000.00 |
| Total Operating Expenses | $391,312.50 |
| Operating Profit (Loss) | $17,462.50 |

**<u>Exhibit B</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Shelby Division**

IN RE:

ROBBINS SERVICE GROUP, LLC,

     Debtor.[7]

Chapter 11

Case No. 23-40082

## INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL

THIS MATTER came before the Court on the Emergency Motion of the Debtor for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral and Granting Related Relief [Docket No: ____] (the "Motion")[8]. Based upon a review of the record, the contents of the Motion, the statements of counsel, and the evidence offered at the hearing on the Motion, the Court finds and concludes that the relief requested in the Motion is in the best interests of the Debtor, its estate, and its creditors; proper and adequate notice under the circumstances has been given to all interested parties; and good cause exists to grant the Motion herein. By entry of this Order, the Court makes the following:

---

[7] Debtor is the following entity (the last four digits of its taxpayer identification number follow in parentheses): Robbins Service Group, LLC (6879). The Debtor's address is 4340 N NC 16 Business Highway, Denver, North Carolina 28037.
[8] Terms not otherwise defined herein shall have the meanings set forth in the Motion.

**FINDINGS OF FACT**

1.      On May 15, 2023, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. The Debtor continues in possession of its property and the management of its business as a debtor-in-possession pursuant to Section 1184 of the Bankruptcy Code.

2.      The Debtor is a landscaping company with its operations based in Denver, North Carolina.

3.      The Debtor has one primary secured creditor along with other certain creditors who, upon information and belief, assert an interest in the Debtor's cash collateral.

4.      The Debtor entered into the SBA Loan with Aquesta Bank on or about July 31, 2020. On or about July 28, 2020, Aquesta Bank filed a UCC-1 Financing Statement with the Secretary of State of North Carolina, asserting a blanket lien on the Debtor's assets, including current and future accounts and general intangibles. Upon information and belief, Aquesta Bank is the predecessor in interest of United Community Bank ("UCB").

5.      Additionally, at various times, the Debtor entered into certain agreements with the MCAs. While the Debtor disputes any interest in its cash collateral by the MCAs, for the purposes of this Order, the Court has proceeded with the presumption that UCB and the MCAs hold valid debts owed by the Debtor and that the Debtor's cash collateral is subject to valid, perfected security interests securing the debts in favor of UCB and the MCAs. The Debtor has reserved its right as well as the right of any other party with standing to challenge the same in a later proceeding.

6.      A hearing was held with respect to relief under the Motion on May [*], 2023.

**CONCLUSIONS OF LAW**

7.      This is a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(M), among other provisions, and this Court has authority to enter this Order under 11 U.S.C. 105, 361, and 363, among other sections.

8.      UCB's interest in cash collateral to the extent such interest exists is adequately protected by equity cushion and replacement liens pursuant to Section 361 of the Bankruptcy Code.

9.      The MCAs' interest in cash collateral to the extent such interest exists is adequately protected by equity cushion and replacement liens pursuant to Section 361 of the Bankruptcy Code.

10.     Entry of this Order, granting the Debtor the authorization that follows, is in the best interests of the Debtor, its creditors and other parties in interest in this case.

In view of the foregoing, it is **THEREFORE ORDERED, ADJUDGED AND DECREED** as follows:

A.      The Motion is granted on an interim basis.

B.      This Order is entered without prejudice to any and all claims, rights, and defenses that the Debtor or any other party with standing may have to challenge the nature, validity, or extent of the liens asserted by UCB and/or the MCAs.

C.      Interim Authority to Use Cash Collateral. During the term of this Order, as long as the Debtor complies with the provisions set forth herein, the Debtor is authorized to use cash collateral, on an interim basis, to operate in the ordinary course of business and to pay only those expenses which must be incurred on or before a final hearing on this matter may be held. A copy of the approved cash collateral budget through June 30, 2023, is attached hereto as **Exhibit A**.

D.    <u>Deadline for Authority</u>. A further hearing on the use of cash collateral shall be held on [***] (the "Final Hearing") before the Honorable [***] at the United States Bankruptcy Court, [***]. Any objection to the Debtor's use of cash collateral shall be filed and served no less than seven (7) business days prior to the Final Hearing.

E.    <u>Modifications to the Budget</u>. The Debtor may also utilize cash collateral for expenses not set forth in the Budget without further order of this Court so long as the Debtor's utilization is within a ten percent (10%) variance of the Interim Budget.

F.    <u>Service of Order</u>. Counsel for Debtor shall ensure that a copy of this order is served electronically or by first class mail (which, pursuant to the Bankruptcy Rules, will be deemed sufficient) upon (a) the Bankruptcy Administrator for the Western District of North Carolina; (b) the Internal Revenue Service; (c) the Debtor's twenty largest unsecured creditors; (d) UCB; (e) the MCAs; (f) the Subchapter V Trustee; and (g) those parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, this Order confirms that no other or further notice need be given.

This Order has been signed electronically.  The judge's                United States Bankruptcy Court
signature and court's seal appear at the top of the Order.

**<u>Exhibit A</u>**

**Interim Budget**

# Whispering Pines Landscaping

## Operating Budget

May - July 2023

| | |
|---|---:|
| Revenue | |
| Sales | $985,000.00 |
| CC Fees | $4,925.00 |
| Net Sales | $980,075.00 |
| Cost of Goods Sold | |
| Materials | $236,400.00 |
| Labor | $334,900.00 |
| Total Cost of Goods Sold | $571,300.00 |
| Gross Profit | $408,775.00 |
| Operating Expenses | |
| Wages | $247,000.00 |
| Advertising | $12,312.50 |
| Fuel | $24,000.00 |
| Repairs & Maintenance | $17,000.00 |
| Rent/Lease | $40,500.00 |
| Utilities/Telephone Expenses | $7,500.00 |
| Insurance | $38,000.00 |
| Office Supplies | $5,000.00 |
| Total Operating Expenses | $391,312.50 |
| Operating Profit (Loss) | $17,462.50 |